Paul Kwake
Robert George Vindhurst
Gary Romine
1865 17th Street, Apartment C
Springfield, Oregon 97477
Ph: (541) 731–6054
Email: paulkwakesr@gmail.com
Defendants Pro Se

FILED 27 APR '18 14:23 USDC-ORE

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF OREGON
Eugene Division

| | |
|---|---|
| **PAUL KWAKE,** an individual, **ROBERT GEORGE VINDHUSRT,** an individual, and **GEORGE ROMINE,** an individual <br><br> Plaintiffs, <br><br> -v- <br><br> **FARIBORZ PAKSERESHT,** in his official capacity as Director of Human Services, State of Oregon; and **ASHLEY CARSON-COTTINGHAM**, in her official capacity as Director of Office of Aging and People with Disabilities, a division within the state Department of Human Services, State of Oregon; and **JODY N. CLINE**, in her capacity as Director of Senior and Disability Services, a division within the Lane Council of Governments, <br><br> Defendants. | Case No. 6:18-cv-00603 JR <br><br><br> **MOTION FOR PRELIMINARY INJUNCTION** |

### I. LOCAL RULE 71 CERTIFICATION

1.    In compliance with Local Rule 71, plaintiff Paul Kwake hereby certifies that he

has conferred with the defendants via email and telephone, but has been unable to

resolve the issues in dispute.

## II.     MOTION FOR PRELIMINARY INJUNCTION

2.      For the reasons stated in the below memorandum of law, the plaintiffs move

this court for a preliminary injunction, restoring the status quo for in-home care

assistance to the plaintiffs and other similarly-situated recipients of in-home care

benefits. Fed. R. Civ. Pro. 65(b). Only by sustaining the long-standing status quo of a

higher level of individual care can the plaintiffs' right to due process and to live at

home safely be protected. Allowing the defendants (collectively, "DHS") to cut the

plaintiffs' in-home care hours without considering the risk of removal from their

homes to a less-integrated environment or without providing adequate due process

would violate their constituonally protected rights.

3.      Absent the court's intervention, George Romine and Robert Vindhurst will be

deprived of life-saving services without due process of law.

## III.     MEMORANDUM OF LAW

4.      The severe reductions to the plaintiffs' in-home care hours were made in such a

peremptory and opaque way that the reduction of their in-home care hours violated

their due process rights. The plaintiffs' request for interim relief is well-trodden

territory in the Ninth Circuit. *K.W. ex rel. D.W. v. Armstrong*, 789 F.3d 962, 974 (9th

Cir. 2015) (holding preliminary injunction appropriate where systemic cuts to Idaho's

in-home care services for people with developmental disabilities were likely to violate

the ADA and due process clause); *M.R. v. Dreyfus*, 663 F.3d 1100, 1102 (9th Cir. 2011),

*opinion amended*, 697 F.3d 706 (9th Cir. 2012) (cuts to in-home care hours adequately

stated basis for preliminary injunction where they exacerbated risk of

institutionalization under the ADA); *V.L. v. Wagner*, 669 F. Supp. 2d 1106, 1121 (N.D.

Cal. 2009), *order enforced*, No. C 09-04668 CW, 2009 WL 4282079 (N.D. Cal. Nov. 25,

2009) (granting preliminary injunction halting reductions in in-home care hours based

on due process and ADA claims).

5.     The overwhelming consensus of these cases is that courts should and must grant interim injunctive relief where plaintiffs show either that a state has cut in-home care services without adequate notice to the consumer or where such cuts put consumers in danger of removal to a less-integrated setting.

6.     The plaintiffs are entitled to preliminary injunctive relief if they show (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent a preliminary injunction; (3) that the balance of equities tips in favor of issuing an injunction; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

7.     Alternately, the plaintiffs may argue that, where she a balance of harms tilting sharply in the plaintiffs favor, the court need only find a fair chance of success on the merits, irreparable harm, and favor to the public interest in order to grant the preliminary injunction. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

8.     The plaintiffs argue each of the four *Winter* prongs in turn, and separately address the alternative "strong questions and sharply tilted balance of harms" formulation of the same calculus.

9.     The factual allegations in this motion have already been stated in the complaint filed with the court. For the sake of brevity they will not be repeated in this motion but are incorporated in thier entirety by reference to the complaint.

## A.     The Plaintiffs Are Likely to Prevail on the Merits of Their Claims

10.    A party may obtain a preliminary injunction by showing a likelihood of success on the merits of the claim. *Winter*, 555 U.S. at 20.

In the present case, the plaintiffs are likely to succeed on their due process claim, since DHS's service cuts and the lack of notice violate black letter due process law requiring individualized notice. The plaintiffs are also likely to succeed on the integration mandate claim under the ADA and Rehabilitation Act because multiple decisions the Ninth Circuit have granted preliminary injunction motions for similar service cuts that put people with disabilities at risk of placement in less integrated settings.

11.    The issues and arguments presented in this case bear a striking similarity to another case that is currently before this court, Civ. No. 6:17-cv-00564. An Order on Motion for Preliminary Injunction was signed by the Honorable Judge McShane on April, 19, 2017, attached as exhibit 2 to the complaint filed in this case.

   i.    **Providing Boilerplate, Nonindividualized Notice in Reducing Services and Benefits Violates Basic Due Process Norms**

12.    The reduction of government benefits in disability programs and public welfare programs are a sufficient property interest to require due process protections before any change in status. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *Atkins v. Parker*, 472 U.S. 115, 130 (1985); *Goldberg v. Kelly*, 397 U.S. 254, 266 (1970). In virtually every government benefits case, courts have held that reasonable notice and a meaningful opportunity to be heard must be provided before the benefit is removed. *Goldberg*, 397 U.S. at 267-68. Adequate notice must "give[] an agency's reason for its action in sufficient detail that the affected party can prepare a responsive defense." *Barnes v. Healy*, 980 F.2d 572, 579 (9th Cir. 1992).

13.    Due process is not satisfied by a notice that would leave a claimant "guessing what evidence can or should be submitted in response and driven to responding to

every possible argument against denial at the risk of missing the critical one altogether." *Gray Panthers v. Schweiker*, 652 F.2d 146, 168-69 (D.C. Cir. 1980). Since typical benefit reduction or denial cases rely on allegations of "incorrect or misleading factual premises or on misapplication of rules or policies to the facts of particular cases," the notice must show both the underlying factual premises of agency action and illustrate how the agency applied its rule to the case. *Goldberg*, 397 U.S. at 268.

14.    In the present case, DHS produced notices that gave no meaningful factual or legal explanation for the cuts to the plaintiffs' services.4 Instead, DHS's notice presents essentially the same lack of detail in notices enjoined by the District of Idaho and on appeal in 2015 in *K.W.. K.W. ex rel. D.W. v. Armstrong*, 298 F.R.D. 479, 490 (D. Idaho 2014), *aff'd K.W.*, 789 F.3d 962.

15.    In *K.W.*, the Idaho counterpart of Oregon's DHS sent out notices of cuts in services to people with developmental disabilities broadly stating that some combination of changes in the consumer's needs, in their behavior assessment, in Idaho or federal law, or in the Medicaid tool resulted in reductions in services. *K.W.*, 298 F.R.D. at 490. The lack of individualized notice left Idahoans with disabilities to "do the math and hope [their] post hoc analysis matches the analysis actually employed by" Idaho authorities. *Id.*at 491. The Ninth Circuit agreed with the District Court's requirement of individualized notice. *K.W.*, 789 F.3d at 974 (holding notices inadequate "because they did not specify why participants' budgets had decreased").

16.    Due process requires meaningful notice that articulates why benefits have been cut *ex ante*, rather than encouraging agencies to cut services broadly and come up with excuses later. The notice provided to the plaintiffs did not explain the needs assessment or formally incorporate it as an exhibit. The notice does make consumers

25

aware that the needs assessment was relied on and was available upon request, although merely making the assessment available does not meet the due process notice requirement. *Barnes*, 980 F.2d at 579 (alleging that beneficiary "can request further explanation or an accounting misses the point" because burden to perfect notice falls on government, not beneficiary); *Vargas v. Trainor*, 508 F.2d 485, 489 (7th Cir. 1974) (ruling due process not satisfied by the opportunity to consult with a caseworker).

17.   Basic concepts of due process going back decades require that individualized notice of the reasons for reductions or terminations in public benefits be provided in the original notice, whenever individualized cuts are made.[1] The notices issued to plaintiffs contained no meaningful explanation of the factual premise or the legal justification for the reduction in services. The formula used to calculate their benefits is wholly secret and has not been disclosed to them or to the public. Basic due process norms do not allow benefits cuts on the basis of undisclosed legal and factual premises.

ii.   **The Plaintiffs Are Likely to Succeed on Their Claim that Calculating Their Benefits Using a Secret Formula Violates Due Process**

18.   Even for a consumer who has a copy of the needs assessment, DHS's notice does

---

1   Courts recognize a "broad statutory change" exception to the individual notice rule, allowing non-individualized notices to issue in cases of systemic statutory change that alter the whole program, where individualized notice would be meaningless and unnecessary. *Atkins*, 472 U.S. at 130 (food stamp recipients did not require individualized notice where Congress passed a statute reducing benefits for all recipients); *Pashby v. Delia*, 709 F.3d 307, 328 (4th Cir. 2013) ("broad statutory change" completely altering North Carolina's in-home care program did not require individualized notices). Here, DHS's notices of reduced services reflected only internal tinkering with its own algorithm, not a statutory change that drastically altered the program. *See* Jt. Comm. on Ways & Means, Oregon Legislature, Preliminary Budget Report and Measure Summary—SB 5701A, at 39 *available at* https://olis.leg.state.or.us/liz/2016R1/Downloads/CommitteeMeetingDocument/89392 (ordering DHS to take steps to contain costs that "do not require statutory changes"). Further, the notices of reduced services conflated reductions due to changed needs and those due to system-wide policy changes, making it impossible to distinguish hours cuts related to an individual's allegedly reduced need and those related to changes in the algorithm.

not explain *how* the assessment turns the needs assessed into hours of care. The algorithm is a secret, not disclosed or explained to consumers. The secret nature of the algorithm that determines the results of the assessment further denies due process to the plaintiffs. "[W]ritten notice must explain the formula by which the benefit amount was calculated." *Ford v. Shalala*, 87 F. Supp. 2d 163, 178 (E.D.N.Y. 1999) *judgment entered sub nom. Ford v. Apfel*, No. CV-94-2736 (CPS), 2000 WL 281888 (E.D.N.Y. Jan. 13, 2000). 19. The risk of wrongful calculation of a benefit is particularly acute where a beneficiary has "no meaningful way to ascertain whether agency calculations as to grant amounts are accurate." *Schroeder v. Hegstrom*, 590 F. Supp. 121, 127 (D. Or. 1984). "Unless a person is adequately informed of the reasons for denial of a legal interest, a hearing serves no purpose and resembles more a scene from Kafka than a constitutional process. " *Gray Panthers*, 652 F.2d at 168; *Dilda v. Quern*, 612 F.2d 1055, 1057 (7th Cir. 1980) (due process in reduction in welfare benefits required detailed "breakdown of income and allowable deductions" in notice). Here, not only is the formula for determination not provided in the notice, it is completely unobtainable. 20. Generally, a "dramatic reduction of services to persons who had been previously approved under the rules" without any change in the underlying rules is *prima facie* evidence of arbitrary decisionmaking that violates substantive due process. *M.A. v. Norwood*, 133 F. Supp. 3d 1093, 1099 (N.D. Ill. 2015); *see also Mayer v. Wing*, 922 F. Supp. 902, 911 (S.D.N.Y. 1996) ("The capricious nature of these decisions [cutting in-home care hours] is evidenced by the fact that Plaintiffs received notices of reduction while in the same or worse physical condition they were in when home care was initially authorized, and were given no explanation for why they were assessed differently the second time around.").

21.   Although DHS's explanation of the cut in its model notice states that DHS was generally instructed by the state legislature to review its assessment to reduce in-home care hours[2], the notice does not indicate whether or how the past assessment was inaccurate for the particular consumer who receives the notice.

22.   Taken together, the opacity of the formula for calculating benefits and the aberrant results, where consumers with the same or increased needs experienced service reductions, violates both procedural and substantive due process.

   iii.   **The Plaintiffs Are Likely to Succeed on Their Claims that DHS's Exceptions and Administrative Appeal Processes Violate Due Process**

23.   DHS violates due process by creating caps on services that cannot be effectively challenged in an administrative appeal, but must go through the exceptions process, an opaque process in which the consumer cannot meaningfully participate. A basic requirement of due process is the opportunity to be heard at a meaningful time in a meaningful manner. *Goldberg,* 397 U.S. at 267.

24.   As described in the complaint, certain benefits beyond DHS-imposed caps—incorporated into the secret algorithm of the assessment tool—are only obtainable through the exceptions process. No matter how great an individual need is, the consumer can never get above a certain level of care through the needs assessment tool, which apparently incorporates designated service caps.

25.   To obtain relief exceeding those caps, a consumer would have to go through the exceptions process. The notice provided by DHS does not tell consumers that the

---

2 DHS's characterization of the Budget Note in its model notice is incorrect. The Oregon Legislature only directed that DHS "take immediate action that may help contain costs without changing the current service system structure. . . ." The legislature then *noted,* without instructing DHS to follow through, that DHS's own "action plan includes . . . tak[ing] action to more efficiently align service authorization with people's needs . . . ." Preliminary Budget Report—SB5701A, at 38-39. The legislature did not specifically instruct DHS to alter its assessment; DHS created its own plan to change the tool on its own initiative.

exceptions process exists or how to invoke it. A consumer who figures out how to request an exception cannot appear before the exceptions committee, cannot present live argument, has no right to offer live testimony, and can only guess at what concerns the committee may have. The consumer can only file an exceptions request, presenting any argument or documentation that seems best to them, and hope for the best.[3] "It is not enough that a welfare recipient may present his position to the decision maker in writing or second-hand through his caseworker." *Id.* at 269.

26. This exceptions procedure is particularly inappropriate given 1) DHS's already inscrutable and generic notice of reductions in service that hinder a person from preparing useful argument and 2) the unique circumstances of every consumer's disability and how it affects the consumer's life and needs. Unlike primarily financial benefits, like TANF or food stamps, where the scope of benefits is primarily a mathematical question, in-home care hours are uniquely oriented around the specific needs of a person with disabilities[4]. Relevant testimony and argument would be specially focused on the unique needs of the individual to receive certain kinds of assistance in order to remain at home and in the community. These needs require the opportunity to meet with committee members and offer direct evidence and argument.

27. The administrative hearing process is no help to the consumer either. At an administrative hearing, DHS rules make the process into a sham. The measure of the

---

3 The exceptions process is not explained or defined anywhere in Oregon Administrative Rules or statutes. The best description comes through DHS's website. *See* Oregon Office of Developmental Disabilities, Exceptions Process Step 2, *at* http://www.oregon.gov/DHS/SENIORS-DISABILITIES/DD/Pages/Exception-Step2.aspx (stating that, once the consumer's request is received, "it will be reviewed by someone at ODDS" and ODDS will make its decision, with no indication that the consumer may participate beyond initial submission of the request).

4 42 U.S.C. 1396n(k)(1)(A)(iv) (requiring that services administered under the Medicaid plan at issue should be "controlled, to the maximum extent possible, by the individual or where appropriate, the individual's representative"); 42 U.S.C. 1396n(k)(1)(A)(i) (requiring states using the Medicaid plan at issue to provide in-home attendant supports "under a person-centered plan of services and supports that is based on an assessment of functional need").

individual's service level is whatever the needs assessment determined, and the hearing officer is not permitted by law to award any higher benefit than that already provided by the needs assessment. OAR 411-450-0020(21); OAR 411-450-0060 (7)(b).

An appellant who claims at the hearing that the needs assessment did not give him enough hours and presents evidence showing the inadequacy of the hours in meeting her needs will simply be told that he is entitled to no more hours than the assessment gives him. Such an approach is not "meaningful" as due process requires.

## iv.    The Plaintiffs Are Likely to Succeed in Their Argument That DHS Puts Consumers at Risk of Placement in Less Integrated Settings

28.    The Americans with Disabilities Act and the Rehabilitation Act both require government agencies to operate their programs in the "most integrated setting." *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581, 599 (1999); *M.R.* 697 F.3d at 733; 28 C.F.R. 41.51(d); 28 C.F.R. 35.130(d). Any change in benefits that "exacerbates [the] risk" of placement in a less integrated setting for a person with disabilities constitutes prohibited discrimination under the Americans with Disabilities Act and the Rehabilitation Act. *M.R.,* 697 F.3d at 729. The plaintiffs are the elderly and the disabled, DHS and Lane County Council of Governments are public entities, and all defendants receive federal funds. The cuts in services will exacerbate the risk of placement in a less integrated setting, and thus they violate the Rehabilitation Act's integration mandate.

29.    The civil rights statutes prohibiting discrimination against the elderly and people with disabilities includes this integration mandate for two fundamental reasons. First, centuries of government policy favoring confining people with developmental disabilities (as well as other disabilities) seriously hindered the ability of people with disabilities to exercise their fundamental constitutional rights: to vote,

to form families, to go out into the community, and to exercise the basic liberties that others take for granted. *Olmstead*, 527 U.S. at 601. Second, the preference to keep people with disabilities locked away out of the sight of the community was rooted in deep animus against people with disabilities, as unsightly, undesirable, and otherwise not worthy of partaking in society. *Id.* at 600.

30.    The cuts to Robert Vindhurst's and Gary Romine's services have seriously increased the risk of his removal from his home and placement in a less integrated setting. In an integration mandate claim, a plaintiff need not show he has "'no choice' but to submit to institutional care" but only that state action creates "a serious risk of institutionalization." *M.R.*, 697 F.3d at 734.

### v. Refusal to Grant Interim Relief Would Lead to Serious, Irreparable Harm

31.    In the Ninth Circuit, reduction of or loss of medical care benefits generally constitutes irreparable harm. *Beltran v. Myers*, 677 F.2d 1317, 1322 (9th Cir. 1982); *Brantley v. Maxwell-Jolly*, 656 F. Supp. 2d 1171, 1176 (N.D. Cal. 2009) (collecting cases). Ninth Circuit case law is so strong on this point that a failure to find irreparable harm in service or payment cuts that impair access to Medicaid benefits is an abuse of discretion by a district court. *Arc of California v. Douglas*, 757 F.3d 975, 991 (9th Cir. 2014). "A lack of medical services is exactly the sort of irreparable harm that preliminary injunctions are designed to address." *Fishman v. Paolucci*, 628 F. App'x 797, 801 (2d Cir. 2015). Denial of a constitutional right, including the right to due process, is likewise an irreparable injury. *Elrod v. Burns,* 427 U.S. 347, 374 (1976); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012);

32.    Taking advantage of the familial bonds to shift state responsibilities imposed by Medicaid law onto parents and other loved ones to provide services is prohibited by

federal law. 42 C.F.R. 441.540(b) (familial natural supports can only substitute for paid attendant care when and to the extent they "are provided voluntarily to the individual in lieu of an attendant"). *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997)

33.     Plaintiff Robert Vindhurst is disabled and receives Medicaid. He has lived in Paul Kwake's adult foster home for almost 4 years and was diagnosed with Multiple Sclerosis several years ago. Multiple Sclerosis is a progressive disability that detoriates muscular function, affects cognitive ability & may also cause organ failure.

34.     When Robert Vindhurst first moved into the adult foster home in 2014, he was ambulatory and needed only some assistance with his activities of daily living. He has been, over the last 4 years, physically deteriorating and he is now in the advanced stages of MS. He has lost all bowel and bladder control, and has a catheter which needs to be cleaned and changed at least 3-4 times a day. He is wheelchair bound and requires 2 care attendants for transfers. When he goes to church, the store, and/or other outings, he requires an attendant with him at all times due to his loss of muscular control. He needs someone to assist him in eating due to him being a choking hazard. His cognitive functioning is deteriorating, and he forgets where he is and what he is talking about.

35.     Plaintiff Gary Romine is a 71 year old adult foster home resident on Medicaid. He has paranoid delusional dementia and has difficulty managing his behaviors and requires assistance with almost all of his activities of daily living.

36.     These plaintiffs would be seriously and irreversibly harmed by the reduction of their benefits. Denial of these services will put consumers at risk of removal from their homes, at risk of choking, and at risk of isolation for long periods of time without the

ability to communicate. These harms are typical of the kind of "irreparable harms" contemplated in preliminary injunctions. *See, e.g., Peter B. v. Sanford*, No. CIV.A. 6:10-767-JMC, 2010 WL 5912259, at \*10 (D.S.C. Nov. 24, 2010) (endorsing specific plaintiff risks, including choking risks, as irreparable harm justifying preliminary injunction), *report and recommendation adopted*, No. 6:10-CV-00767-JMC, 2011 WL 824584 (D.S.C. Mar. 7, 2011).

### vi. The Balance of Equities and the Public Interest Strongly Favor Restoring the Prior In-Home Service Hours to the Plaintiffs and the Class

37.     For the final two *Winter* standards, the court must consider whether the balance of equities between the parties and the public interest would be best served by granting relief. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In litigation against the government, these two prongs merge in the analysis. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). The plaintiffs' interests would obviously be served by returning in-home care hours to their December, 2017 levels. No substantial state interest would be impaired by increasing those hours, and state interests in economy might be served by preventing removal from the home. Finally, the public's interest in the smooth, transparent, and fair operation of its system of Medicaid benefits would be ensured by granting the injunction. "[T]he balance of hardships favors beneficiaries of public assistance who may be forced to do without needed medical services over a state concerned with conserving scarce resources." *M.R.*, 697 F.3d at 731.

38.     Public interests are presumed to be served by the clear and fair operation of systems of public creation, especially in the provision of social services to those in great need. "[T]here is a robust public interest in safeguarding access to health care for those eligible for Medicaid . . . ." *Indep. Living Ctr. of S. California, Inc. v.*

Page 13 of 17     MOTION FOR PRELIMINARY INJUNCTION

*Maxwell-Jolly*, 572 F.3d 644, 659 (9th Cir. 2009), *reversed on other grounds sub nom. Douglas v. Indep. Living Ctr. of S. California, Inc.*, 132 S. Ct. 1204 (2012).

39.     The state's general interest in managing its own budget, even in times of financial crisis, do not outweigh the interest of poor and disabled people in obtaining adequate care. *Id.* Budgetary concerns, if considered, might well tip in favor of granting the injunction[5].

40.     Every similar case in this circuit reviewing the balance of equities and the public interest has come out in favor of the individuals accessing medical care and against the position of the state cutting services. *K.W.*, 298 F.R.D. at 493; *M.R.,* 697 F.3d at 737-38; *Indep. Living Ctr.*, 572 F.3d at 657-58; *Brantley*, 656 F. Supp. 2d at 1177. The plaintiffs put forward a proven legal theory in favor of relief. "It would be tragic, not only from the standpoint of the individuals involved but also from the standpoint of society, were poor, elderly, disabled people to be wrongfully deprived of essential benefits for any period of time." *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir.1983).

41.     Consideration of the balance of equities and the public interest in ensuring adequate care for the elderly and people with disabilities in their homes and in the community, the last two *Winter* factors weigh heavily in favor of a preliminary injunction.

5   *M.R.*, 697 F.3d at 738 (holding that consideration of risks of forcing people from home and community based care into less integrated, more expensive settings suggested service cuts "may have an adverse, rather than beneficial [budgetary] effect"); *V.L.*, 669 F. Supp. 2d at 1122 (finding compelling evidence that "in-home care is considerably less expensive than institutional care and [in-home] caregivers reduce the need for expensive emergency room visits and hospitalization"); *see also* Office of Developmental Disabilities, Presentation to Joint Ways and Means Subcommittee on Human Services, March 21-22, 2017, at 13 (showing per case costs of in-home care are projected to be roughly six times cheaper than group home care for children from 2017 to 2019) *available at* http://www.oregon.gov/DHS/ABOUTDHS/DHSBUDGET/20172019Budget/ODDS%20Ways%20and%20Means.pdf ; *id.* at 15 (showing per case costs of in-home care are projected to be roughly three times cheaper than group home care for adults from 2017 to 2019).

vi. **Formulated in the Alternative, the Plaintiffs Have Also Raised Serious Legal Questions Going to the Merits, and the Balance of Hardships Tilts Strongly in Their Favor**

42. The plaintiffs have made out the primary case for a preliminary injunction under the four *Winter* factors. Given the wealth of case law in the Ninth Circuit unanimously approving preliminary injunctions maintaining in similar circumstances, plaintiffs have strongly stated their case for a likelihood of success on the merits. Even if the court finds that the plaintiffs have not shown that degree of likelihood of success, the court may grant interim injunctive relief if the plaintiffs have shown serious legal questions going to the merits of the case, and a balance of hardships sharply tilted in the plaintiffs' favor. *Alliance for the Wild Rockies*, 632 F.3d at 1134-35.

43. The "serious questions" test is not really an alternate theory of relief, but a different articulation of the four traditional factors of the *Winter* test, weighed on a sliding scale. *Id.; Lopez v. Brewer*, 680 F.3d 1068, 1073 (9th Cir. 2012). At least one of the major in-home care Medicaid benefits cases in the Ninth Circuit resulted in a preliminary injunction on this alternative formulation of the test. *M.R.*, 697 F.3d at 736 (plaintiffs raised serious questions as to whether proposed changes to Washington state Medicaid system would constitute a fundamental alteration).

44. A party raises a "serious question going to the merits" of a case where he has "a fair chance of success on the merits." *California Pharmacists Ass'n v. Jolly*, 630 F. Supp. 2d 1154, 1158 (C.D. Cal. 2009) *quoting Sierra On–Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir.1984). Where a party has shown that the balance of equities tips sharply in its favor, the court need only find that the party has a fair chance of success, rather than likely success, along with finding the other two

*Winter* factors. Although the plaintiffs have made a strong showing of likely success, the court should be aware of this alternative formulation of the balancing of the *Winter* factors, in case it weighs the various factors of the test differently.

### vi. The Court Can and Should Waive the Requirement for a Bond

45. Civil Rule 65 permits a court discretion to set the amount of security, if any, at the time of issuing preliminary injunctive relief. Fed. R. Civ. Pro. 65(c). The rule and case law both explicitly authorize a court discretion to impose no bond on the parties. *Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005).

46. In general, courts have waived the bond in cases of substantial public interest where the state can better bear the cost and the financial means of the plaintiffs are "unremarkable." *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999), *supplemented by*, 236 F.3d 1115 (9th Cir. 2001); *accord Diaz,* 656 F.3d. at 1015 (state-employed same-sex couples in equal protection suit arguing for equal spousal benefits not required to pay bond); *Friends of the Earth, Inc. v. Brinegar*, 518 F.2d 322, 323 (9th Cir. 1975).

///

///

///

47.   The exemption from a bond is particularly favored in cases vindicating Medicaid rights. *California Hosp. Ass'n v. Maxwell-Jolly*, 776 F. Supp. 2d 1129, 1160 (E.D. Cal. 2011). Neither Gary Romine nor Robert Vindhurst in this case are not wealthy, given that they qualify for Medicaid and Social Security benefits. It would be unfair and futile to require plaintiffs to post a bond covering the cost of all restored services to the state of Oregon.

Dated 23 April 2018

Paul Kwake, Defendant Pro Se

Robert George Vindhurst, Defendant Pro Se

George Romine, Defendant Pro Se

CERTIFICATE OF SERVICE

I hereby certify than on 4-27-18 (date), I made service of the following document:

MOTION FOR PRELIMINARY INJUNTION
(document title)

by placing a copy in a first-class postage paid envelope in EUGENE OR. (city) for delivery by U.S. mail to the address(es) set forth below:

CHRISTINA BEATTY WALTERS
DEPT OF JUSTICE
(name)

Counsel for: FARIBORZ PAKSERESHT
(name of party)

DEPT OF JUSTICE
(mailing address)
100 SW MARKET ST.
PORTLAND OR 97201

[signature]
(signature)

PAUL KNAKE
(name)

1865 17TH ST #C
(address)
SPRINGFIELD
OR. 97477

CERTIFICATE OF SERVICE

I hereby certify than on _4-27-18_, I made service of the following document:
*(date)*

_moTioN FoR PRELiMiNERY INJuNTioN_
*(document title)*

by placing a copy in a first-class postage paid envelope in _EuGENE, OR_    for
*(city)*

delivery by U.S. mail to the address(es) set forth below:

_CHRISTINA BEATTy- WALTERS_
*(name)*

Counsel for:  _ASHLEY CARSON - COTTINGHAM_
*(name of party)*

_DEPT OF JUSTICE_
*(mailing address)*
_100 SW MARKET ST_
_PORTLAND, OR. 97201_

_____
*(signature)*

_PAUL KWAISF_
*(name)*

_1865 17TH ST # C_
*(address)*

_SPRINGFIELD OR 97477_

CERTIFICATE OF SERVICE

I hereby certify than on _H-27-18_ , I made service of the following document:
*(date)*

_MOTION FOR PRELIMINERY INJUNTION_
*(document title)*

by placing a copy in a first-class postage paid envelope in _EUGENE OR_    for
*(city)*

delivery by U.S. mail to the address(es) set forth below:

_JODY N. CLINE - DEFENDANT_
*(name)*

Counsel for: _____
                 *(name of party)*

_LUOG_
*(mailing address)*

_1015 WILLAMITTE ST_

_EUGENE OR_

_97401_

_____
*(signature)*

_PAUL KWABEE_
*(name)*

_1865 17TH ST #C_
*(address)*

_SPRINGFIELD OR-_

_97477_