FILED 08 MAY '18 13:20 USDC-ORE

Paul Kwake, Daniel Campbell, Dorothy Hawley and Gary Romine
1865 17th Street, Apartment C
Springfield, Oregon 97477
Ph: (541) 915–6736
Email: paulkwakesr@gmail.com
Plaintiffs Pro Se

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
Eugene Division

| | |
|---|---|
| **PAUL KWAKE,** an individual, **DANIEL CAMPBELL,** an individual, **DOROTHY HAWLEY,** an individual, and **GARY ROMINE,** an individual <br><br> Plaintiffs, <br> -v- <br><br> **FARIBORZ PAKSERESHT,** in his official capacity as Director of Human Services, State of Oregon; and **ASHLEY CARSON-COTTINGHAM**, in her official capacity as Director of Office of Aging and People with Disabilities, a division within the state Department of Human Services, State of Oregon; and **JODY N. CLINE,** in her capacity as Director of Senior and Disability Services, a division within the Lane Council of Governments, <br><br> Defendants. | Case No. 6:18-cv-603-JR <br><br> **FIRST AMENDED COMPLAINT –** (Injunctive Relief, Declaratory Relief) <br><br><br> Civil Rights Action (42 U.S.C. 1983, U.S. Const., Amdt. XIV, 42 U.S.C. 12131 *et seq.*, 29 U.S.C. 794, Social Security Act, Chapter XIX, 42 U.S.C. 1396 *et seq.*) |

I. INTRODUCTION

1.     This is an action for injunctive relief and declaratory relief by individuals residing in the adult foster care home of Paul Kwake in the State of Oregon for violations of Federal Law, including the Fourteenth Amendment to the United States Constitution, the Americans with Disabilities Act 42 U.S.C. § 12101, the Rehabilitation Act 29 U.S.C. § 701, the Medicaid Act 42 U.S.C. § 1396, the Social Security Act 42 U.S.C. § 7, the Older Americans Act 42 U.S.C. § 35,  and the Civil Rights Act 29 U.S.C. § 794.

2.      The issues and arguments presented in this case bear a striking similarity to
another case that is currently before this court, Civ. No. 6:17-cv-00564. (attached as
Exhibit 1 to the original complaint)

3.      Plaintiffs Gary Romine, Daniel Campbell, and Dorothy Hawley are disabled adults
receiving services and / or benefits from the state of Oregon's Office of Aging and People
with Disabilities and the Senior and Disability Services, a division within the Lane Council
of Governments, including state-funded in-home care services.

4.      In the past four months, those in-home care hours have been cut for the plaintiffs
entitled to those in-home care hours. In notices to the people affected by the cuts, the
defendants supplied no individualized explanation for those cuts, justifying them only by
citing to an opaque needs assessment tool, whose operation is not explained in the notice
or anywhere else. No one receiving a similar notice would understand what changes to
their inhome care hours were attributable to alleged changes in individual need or what
changes were attributable to statewide cuts to service hours. The arbitrary manner in
which they were notified of the slashed supports, without a meaningful explanation of the
reasons for reduced supports, violates the Due Process Clause of the Fourteenth
Amendment.

5.      The state's systemic service cuts and its unreasonable and arbitrary constructions
of its own rules also violate the terms of the Medicaid Act. The state receives a higher level
of federal reimbursement, on the condition that the state provide consumer-directed,
home-based care that fully meets the medical needs of the individual. 42 U.S.C. 1396. The
state may not ration or cut benefits in a manner that fails to meet the medical and social
needs of eligible consumers.

6.      The plaintiffs ask the court to hold the state and it's agents to the standards set for it
by law: to provide care that meets the needs of the individuals that it serves, to favor in-

home and community-based services over segregation and isolation of people with disabilities, to base its decision-making on consumer-oriented, transparent, and means-tested metrics, and to explain the reasons for cuts in services in a manner that allows a layperson to understand them and, when appropriate, to challenge those decisions.

## II. JURISDICTION AND VENUE

7.      Jurisdiction of this Court arises under 42 U.S.C. § 12101,  29 U.S.C. § 701, 42 U.S.C. § 1396, 42 U.S.C. § 7, 42 U.S.C. § 35, and supplemental jurisdiction exists for the state law claims pursuant to 28 U.S.C. § 1367. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202.

8.      Venue in this District is proper pursuant to 28 U.S.C. § 1391(b) in that the Defendants' conduct complained of occurred within the State of Oregon.

## III. PARTIES

9.      Plaintiff Paul Kwake (hereinafter "PK") is the primary care provider and is the licensee of the Adult Foster Home located in Springfield, Oregon in which Daniel Campbell, Dorothy Hawley and Gary Romine reside.

10.     Plaintiff Daniel Campbell, from hereafter referenced as "DC", is a 65 year old disabled resident of Paul Kwake's state licensed Adult Foster Home. DC is an amputee with stage 3 Parkinson's disease and requires full assistance in most of his activities of daily living (hereinafter "ADLs")

11.     Plaintiff Gary Romine, from hereafter referenced as "GR" is a 71 year-old disabled resident of Paul Kwake's state licensed Adult Foster Home. He has paranoid delusional dementia and has difficulty managing his behaviors and requires assistance with almost all of his ADLs (Activities of Daily Living).

12.    Plaintiff Dorothy Hawley, from hereinafter referenced as "DH" is a 58 year-old disabled resident of Paul Kwake's state licensed Adult Foster Home. She suffers from Schizophrenic Affective Disorder, Bi Polar Disorder, and Cirrhosis of the liver, Anxiety, Diabetes and Dysplasia.

13.    Defendant Fariborz Pakseresht is the Director of the Department of Human Services, an agency of the state of Oregon responsible for administering a wide variety of social services to Oregonians, including seniors and Oregonians with disabilities.

14.    Defendant Ashley Carson-Cottingham is the Director of the state of Oregon's Office of Aging and People with Disabilities, a unit within the state Department of Human Services ("DHS"). Her official duties include administering state programs relating to services for people aged 65 or older and/or person's with disabilities.

15.    Defendant Jody N. Cline in her capacity as Director of Senior and Disability Services, a division within the Lane Council of Governments ("LCOG"). The Lane Council of Governments is contracted with the State of Oregon to provide the eligibility assessments for DHS services.

## IV. FACTUAL ALLEGATIONS

16.    Paul Kwake opened up his first foster care home in February 2011. He has been continuously in the foster care business since then.

17.    Paul Kwake has never been found to have any violations for the past 7 years.

18.    As a state licensee for foster homes, PK is responsible for the care and well-being of his residents including a financial responsibility when he is a payee for his residents. In fact, if PK denied services of any type / kind, he would be in violation of state/federal laws. PK has a legal responsibility to meet the needs of the residents living in his foster home.

19.    Over the last 5 years, PK has catered to the more challenging residents, such as serving adults with a traumatic brain injury, debilitating diseases such as multiple sclerosis

and Parkinson's disease, & individuals with high behavioral issues which require more attention.

20. In order to accommodate these specialized individuals, PK has to increase his staff on hand to ensure the best possible quality of life and the safety of the public and the other residents in the foster home.

21. When DC, DH and GR came to reside at PK's adult foster home, there were discussions with the defendants that if an exceptions payment for additional needs would be needed for either individual, PK could submit the appropriate DHS form for approval.

22. PK submitted the appropriate DHS forms for the exceptions funding on behalf of DC, DH and GR which were approved and re approved, not only once, but several times, for the previous times up until the filing of this complaint.

23. PK can not decrease DC's, DH's or GR's care at this time, it would be in violatiomn of state and federal laws and unethical. PK is paying for the extra care needs for DC, DH and GR out of his pocket.

24. As the state licensee for the state of Oregon, PK is responsible for their care and cannot decrease that care as per applicable laws.

25. In the past 12 months, PK has been in "elevated" discusions with the current case managers, Marcie Yarborogh & Jordan Crowder, both employees of LCOG.

26. PK was told by one of the above named LCOG employees, that they believed that PK was receiving "too much money" for the care of his individual residents.

27. On or about March 14, 2018 PK sent a letter to defendant Jody N. Cline, informing her of PK's dissatisfaction with her agency and its actions pertaining to Jordan Crowder and requested that defendants do not allow any previous assessor to be involved with any assessment of any other of his residents. Based upon PK's experiences in working with Marcie Yarborogh and Jordan Crowder, it is PK's belief that they are biased against

himself due to previous interactions. Due to the fact that LCOG has several case managers, PK respectfully requested different unbiased representatives from LCOG to do the reassessments.

28.     On or about March 30, 2018 Marcie Yarborogh called PK and stated that she would be doing the other assessments on April 6, 2018.

29.     Robert Vindhurst (hereinafter "RV") was a resident of of PK's adult foster care home until April 28th, 2018. He is disabled and receives Medicaid. He had lived in Paul Kwake's adult foster home for almost 4 years and was diagnosed with Multiple Sclerosis several years ago. Multiple Sclerosis is a progressive disability that detoriates muscular function. It also affects cognitive ability and may also cause organ failure.

30.     When RV first moved into the adult foster home in 2014, he was ambulatory and needed only some assistance with his ADLs. RV has been, over the last 4 years, physically deteriorating and he is now in the advanced stages of MS.

31.     RV has lost all bowel and bladder control, and has a catheter which needs to be cleaned and changed at least 3-4 times a day.

32.     RV is wheelchair bound and requires 2 care attendants for transfers. When RV goes to church, the store, and/or other outings, he requires an attendant with him at all times due to his loss of muscular control.

33.     RV needs someone to assist him in eating due to him being a choking hazard.

34.     RV's cognitive functioning is deteriorating, and he forgets where he is and what he is talking about.

35.     As a result of RV's continued cognitive and physical deterioration from multiple sclerosis, PK submitted on February 20, 2016 an exceptions request for additional support of 8 hours a day to provide the care that RV requires. This first exceptions were granted by DHS and valid for the following 12 months. RV's exception funding expired the next year

Page 6 of 27          FIRST AMENDED COMPLAINT

and was reassessed in February of 2017.

36.     RV's reassessment was done at the end of January 2017, and the exceptions
funding was continued at the additional 8 hours a day for the following year through
February 2018.

37.     On or about January 18, 2018, defendants did RV's yearly reassessment and the
appropriate exceptions request form was submitted at that time to continue the 8 needed
hours for his exceptions needs.

38.     PK and RV fully expected that the defendants would continue RV's care needs,
however, their only notice of the exceptions denial was when they received RV's new 512
document which reflected a decrease of approximately 73% in funding, and the exceptions
funding statement was deleted/not included.

39.     As a result of the actions of the defendants and their agents, RV's condition
detiorated to the point where he had to be removed from his home and placed in a more
intensive care setting.

40.     Plaintiff Daniel Campbell is a 65 year-old male who moved into PK's Adult Foster
Home in July 2012.

41.     His right leg was amputated at the knee and he wears a prosthetic right leg. In
addition to that he also wears a supportive metal brace on his left leg for mobility. He is
able to walk with a walker, but is a fall risk so an attendant stays with him. He is diabetic
and his blood sugar levels needs to be checked three times a day. He has a pubic catheter
which needs to be emptied, flushed and cleaned at least two to three times a day.

42.     He has been diagnosed as Stage 3 Parkinson's disease. With his Parkinson's, he
has severe tremors, which prevents him from eating on his own, performing his grooming
and hygiene on his own, being able to go to the bathroom on his own, and performing the
normal activities of daily living without assistance and guidance from our staff.

43.     DC also suffers from periodic episodes of delusions where he carries on conversations with non-existent people and he believes in his delusion that he is in a different place such as Texas or Oklahoma.

44.     On or about February 15, 2015, Paul Kwake submitted an Exception Request for an additional 6 hours on form SDS-0514A, to the case manager for Senior and Disabled Services / LCOG to be forwarded on to state of Oregon Office of Aging and People with Disabilities for approval. This was approved for an additional six hours of one on one care for DC, and was approved for April 1, 2015 to March 31, 2016.

45.     On or about the first of March 2016, PK again submitted the appropriate form SDS-0514A to Senior and Disabled Services / LCOG to continue the Exceptions for six hours a day for DC to be renewed. On or about April 1st, 2016, the six- hour a day Exception was re-approved by DHS to run from April 1, 2016 to March 31, 2017.

46.     On or about March 1, 2017, PK was advised by Senior and Disabled Services / LCOG that they "felt there was no need for one on one extra hours for DC", and they would not be forwarding the Exception to the state of Oregon Office of Aging and People with Disabilities at this time.

47.     On or about April 5, 2017, PK called the state of Oregon Office of Aging and People with Disabilities in Salem and spoke with Margaret May. She advised me that Senior and Disabled Services / LCOG had requested a telephone conference with her to discuss the need to continue the six hour Exception for DC as they "felt it was not needed." Margaret May advised PK to call back after she had spoken with Senior and Disabled Services / LCOG. When PK did call her back, Margaret told him that Senior and Disabled Services / LCOG did not want to approve the Exception request for the current year, but that she and her supervisor would discuss it.

48.     Paul Kwake requested to speak with her supervisor, and after discussion with

Page 8 of 27          FIRST AMENDED COMPLAINT

them, they approved the continuance of the six- hour Exception for the coming year (2017-2018).

49. On or about March 16, 2018, for the fourth time PK submitted to Senior and Disabled Services / LCOG the standard SDS-0514A form to continue DC support for the extra six hours a day. The only notification that PK has received was on April 19th, 2018, that his six hours exceptions is not extended and DC's service pay will be reduced approximately by 58% effective May 1, 2018.

50. Plaintiff Dorothy Hawley is a 58 year-old female who moved into PK's Adult Foster Home in September 2016.

51. DH suffers from Schizophrenic Affective Disorder, Bi Polar Disorder, and Cirrhosis of the Liver, Anxiety, Diabetes and Dysplasia. She requires the care of additional staff due to her behavioral issues and mental instabilities to ensure a safe and best quality of life for her. Her Borderline Personality Disorder and PTSD, along with the other mental disabilities requires frequent behavior and emotional support from our staff to assist her with her emotional or behavioral issues, to monitor her from self injury, calm her and maintain a peaceful environment for the other residents and the public.

52. Both the Psychiatric Nurse Practitioner, Jackie Hall, and the State Behavioral Specialist Kay Hondel advised PK that it is important to have a care provider with her to maintain support for DH to have a healthy and successful life.

53. Her doctors as well as Ride Source have requested that she has a care provider with her when going to and from all appointments including social appointments. DH has seven different doctors that she sees on a regular basis, plus additional trips to stores, the library and friends, this requires considerable staff time. This has prevented argumentative and defensive interactions with the doctors *that have occurred in the past* as our care providers act as an intermediary.

FIRST AMENDED COMPLAINT

54.  On or about March 2017, PK requested additional support hours for DH for one on one care, and submitted the form SDS-0514-A to Senior and Disabled Services and LCOG. This was approved to start April 2017 to March 31st, 2018.

55.  On or about March 17, 2018 PK submitted form SDS-0514A for renewal of the same hours to Senior and Disabled Services/ LCOG.

56.  On April 19, 2018 PK was advised that the exception hours would be discontinued for DH there by reducing her care pay by 58%.

57.  Plaintiff Gary Romine is a 71 year old adult foster home resident on Medicaid. GR receives care for ADL's through Lane County Senior and Disabled Services.

58.  GR moved into Paul Kwake's state licensed Adult Foster Home located in Lane County, Oregon on or about February 1, 2016. Within the following 6 weeks after GR's move in, it became evident that GR was in need of additional funding to meet his ADL needs.

59.  GR was approved by DHS in early 2016 for medicaid paid assistance to reside in an adult foster home. His initial approval amount for home care based services was approximately $2150 per month to be paid by state of Oregon DHS.

60.  PK submitted the first exceptions funding request on the behalf of GR on March 23, 2016. Defendants granted this request and it was valid through July of 2016.

61.  This first exceptions request was granted for 3 months only for the reason that the defendants wanted additional information from GR's doctors and also wanted the state behavioral specialist to evaluate GR. It is important to note that with each and every exceptions funding requested by PK for GR, in addition to the form provided by DHS, PK submitted relevant documents that supported the need for an exceptions funding payment along with GR's care plan. GR's care plan is a continuance of his care, and it is updated as needed to reflect his individual needs to allow GR to achieve the optimum physical,

mental, social well-being and independence consistent with the mission and goals of DHS.

62. When this first exceptions funding grant expired, PK requested an exceptions again with the same amount of additional funding hours as was in the first request. This second exceptions funding request was granted by defendants and valid for 6 months, expiring in January 2017.

63. Upon the expiration of the second request in January 2017, PK requested, for the third time, an exception for additional funding that was the same as the previously requested exceptions, and this request was granted and valid through the following year.

64. On or about January 2018, PK submitted the fourth request for continuance of the previously granted exceptions funding. It was early in February of 2018 that PK contacted defendants and specifically spoke with a Jordan Crowder, a. manager of adult foster homes through the Senior and Disability Services, a division within the Lane Council of Governments who informed PK that GR would no longer be receiving any additional funding through exceptions or otherwise.

65. PK called the state of Oregon Office of Aging and People with Disabilities and spoke with Margaret May. It was indicated during this conversation that the defendants engaged a phone conference that she was a party to along with Jordan Crowder and it was determined that LCOG/APD did not see the need for any further exceptions funding, based on GR's care plan and other supportive documents.

66. The plaintiffs are funded with Federal Medicaid money for any exceptions payments to provide additional care services for their individual needs, distributed through the Department of Human Services via its agency / departments and / or contractors, in this instance the LCOG Department of Aging and People with Disabilities (hereafter "APD").

67. DHS contracts with county APD and Developmental Disabilities (DDS and/or ODDS) service offices / agencies (such as LCOG), programs and county-wide brokerage services

to administer the case management services for these programs to individual consumers, under the rules created by the state of Oregon Department of Human Services.

68.    These local contractors/branches are responsible for assessing the eligibility of consumers, like the plaintiffs, for qualifying benefits from APD and/or DDS as is applicable to the individual consumer, organizing the continuing assessment of need for services, managing the payment of personal service workers/care attendants, and notifying consumers of when their services will be reduced or terminated, if applicable.

69.    Funding is determined using the standardized needs assessment tool and after the initial funding determination, at yearly intervals as applicable. The needs of people receiving home care based services must be evaluated and re-evaluated using the state's standardized needs assessment tool.

70.    The needs assessment tool, named the "CA/PS" or the "Client Assessment and Planning System", is the state of Oregon DHS's tool for determining the scope of the adult consumer's need. The CA/PS documents the level of need and calculates the individual's service priority level in accordance with DHS, state, and Federal rules, calculates the service payment rates, and accommodates individual participation in service planning.

71.    CA/PS is a single entry data system used for completing a comprehensive and holistic assessment surveying an individual's physical, mental, and social functioning and identifying risk factors, individual choices, preferences, and the status of service needs.

72.    The needs assessment reviews specific areas of potential need for assistance, including: eating, food preparation, toileting, communication, behavioral assistance, medication administration, and bathing.

73.    The needs assessment is done by a Case Manager whom is a LCOG or Area Agency on Aging employee using the needs assessment tool. This assesses the degree of need by entering the applicable individual information for the consumer which enables the

Case Manager to select from pre-created qualitative categories of need, such as by indicating whether the consumer needs full assistance in performing that task, whether the consumer can accomplish the task with partial assistance, or whether the consumer can perform the task independently and without any assistance.

74.    The needs assessment contains an internal and undisclosed algorithm. Based on this algorithm and based on the answers provided by the evaluator, the needs assessment automatically generates a statement of the hours budgeted for care as to each consumer.

75.    Person-centered service plans for individuals receiving HCBS: Person-centered service plans provide the written details of the supports, desired outcomes, activities, and resources required for individuals to achieve and maintain personal goals and health and safety as described in OAR 411-004-0030 as documented by the person-centered service plan coordinator.

76.    All individual exceptions to the assessed service need determination in Adult Foster Homes, Residential Care Facilities, or in-home settings, and renewals of exceptions, must be pre-authorized by the department's APD Central Office

77.    Under state of Oregon DHS rules, a consumer's service level—meaning the total hours of "care" to which they are entitled—is wholly defined by the needs assessment tool.

78.    The relationship between a consumer's need and the hours of care he or she receives is entirely determined by "a formula embedded in the functional needs assessment". There is no meaningful way for a consumer to review or understand this formula.

79.    Plaintiffs did not receive any kind of notice prior to the expiration of the exception payment for DH, DC and/or GR. PK learned of the loss of RV's exceptions/cut in his funding when he received RV's "512".

80.    A 512 is a state of Oregon Department of Health and Human services Seniors and Peoples with Disabilities form that is sent to providers that contains individual client income

and monetary need for services including, but not limited to, the room and board costs of the provider and the amount that the individual client pays and what the state pays. Any exceptions funding will be displayed on the individual client's 512 form by a statement that says: "The service amount includes an exception adjustment. Exception adjustments must be reviewed and re approved periodically. This exception is approved from MM/DD/YYYY to MM/DD/YYYY".

81.   PK first learned of the exceptions funding denial for GR in a phone conversation with an employee of the Lane Council of Goverments. Jordan Crowder denied PK's request for a written copy of the reason of the denial and told PK that he would receive a notice from "Salem".

82.   A consumer, a case worker, a client, or a consumer representative may request an exception (sometimes called "funding review") by requesting the rate or hours exception through their case manager. A case manager may also determine that an exception is needed and initiate the process

83.   Exceptions to Payment Limitations in Home and Community-Based Services:  (1) Service payment exceptions may only be granted if the Department determines: (a) The individual has service needs, documented in the service plan, that warrant a service payment exception; and (b) The provider actually provides the exceptional service.

84.   Service payment exceptions shall be based on the additional hours of services required to meet the individual's assessed and verified ADL and IADL service needs. Exceptional hours are not allowed based solely on choice of the individual. The Department and AAA local office staff must monitor the individual service needs and recommend adjustments to the plan when appropriate.

85.   The client/representative can submit documentary evidence to DHS seeking the exception, but has no right to appear directly before the exceptions committee, no right to

testify or make argument, nor any right to call witnesses. Because of the limited notice, or lack thereof, given to consumers as to the reasons for the reduction, the consumer must only guess what evidence will be compelling to the committee.

**86.** A recent review of the exceptions process for approval of assistive technology revealed that the exceptions committee often denied exceptions requests on the grounds that important information was not provided, even where that information was actually in the client file. Exceptions requests were also denied for lack of certain required information, even when that requirement was not established in any statute or rule.

**87.** When the exceptions committee decides to deny a request based on insufficient documentation, the consumer has no right to supplement the record with that document, once he/she finds out what documentation the committee is actually looking for.

**88.** Service payment exceptions in Adult Foster Homes and Residential Care Facilities may be authorized only for individual service needs that are not paid for by the base rate or any of the three available add-on payments.

**89.** The Department's APD Central Office must review and approve exception requests and transmit the decision and effective date to the Department and AAA local office staff. Approval will only be granted if the exception meets an unmet need and is reasonable to meet that unmet need.

**90.** The Department or the Department's Central Office may deny exception requests. A notice of planned action is required if the individual or their representative requested the exception. In this instance, there was no notice of planned action provided, as was required, for neither DH, DC or GR.

**91.** The exceptions process is an opaque one, in which the consumer has little to no right to participate, where decisions are made arbitrarily and without reference to established standards.

## V. FIRST CLAIM FOR RELIEF

### Declaratory Relief

COUNT 1 - Lack of Adequate Notice Violates the Right to Procedural
Due Process Under the Fourteenth Amendment of the United States Constitution
(Through 42 U.S.C. 1983)

92.    Plaintiffs repeat, realleges & incorporates paragraphs 1 – 68 above.

93.    The Fourteenth Amendment prohibits any state from depriving any person of "life,

liberty, or property, without due process of law . . . ." U.S. Const., Amdt. XIV, Sec. 1.

94.    The defendants' service cuts and the lack of notice violate black letter due process

law requiring individualized notice.

**95.**    There was no notice given either the state of Oregon DHS nor LCOG prior to the

exceptions funding being denied nor was there any notice given that pertained to the

denial and/or the reasons for the denial. There is no way to appeal or review the denial of

the exceptions request for Adult Foster Home or Residential Care Facilities Providers.

**96.**    Under Section 1983, a person may bring a suit to enforce federal constitutional or

statutory rights violated under color of state law. 42 U.S.C. 1983.

**97.**    The reduction of government benefits in disability programs and public welfare

programs are a sufficient property interest to require due process protections before any

change in status. Atkins v. Parker, 472 U.S. 115, 130 (1985); Mathews v. Eldridge, 424

U.S. 319, 335 (1976); Goldberg v. Kelly, 397 U.S. 254, 266 (1970).

**98.**    That due process **must include** a notice reasonably calculated to inform someone

of the reasons for the denial of or reduction in service, and a meaningful opportunity to be

heard on the question, prior to the reduction in service. Goldberg, 397 U.S. at 266-71.

None one of the above mentioned due process rights were given to PK for DH, DC or GR.

**99.**    Adequate notice must "give[] an agency's reason for its action in **sufficient detail**

that the affected party can prepare a responsive defense." Barnes v. Healy, 980 F.2d 572,

579 (9th Cir. 1992). Due process is not satisfied by a notice that would leave a claimant

Page 16 of 27                    FIRST AMENDED COMPLAINT

"guessing what evidence can or should be submitted in response and driven to responding to every possible argument against denial at the risk of missing the critical one altogether." Gray Panthers v. Schweiker, 652 F.2d 146, 168-69 (D.C. Cir. 1980). The lack of any appeal and/or review of the agency's denial is unconstitutional.

**100.** In the present case, DC's, DH's and GR's home care hours were cut substantially, at the same time that his apparent need for care either remained the same or increased.

**101.** The reason given for the cuts in service for GR was that the new needs assessment said that the home care hours should be cut, without explanation of whether or how his need had changed or how that justified the dramatic 73% reduction in his hours. There was no way to distinguish between cuts related to changes in the formula from changes in awarded hours relating to increased or decreased need.

**102.** DC, DH, GR, and PK were deprived of due process for lack of meaningful notice of the reason for the actions against them, and for lack of any appeal rights in regards to the exceptions payment denials.

**103.** The lack of any notices being given and in the alternative if the notice had been provided to the plaintiffs it would have still failed because the generic letter/notice that DHS directed it's contractors/brokerages to provide to consumers lacked any kind of individualized notice, but gave only a boilerplate notice, a practice prohibited by decades of due process law.

104. Plaintiffs ask the court to enter a declaratory judgment in thier favor that the defendants have violated thier Constitutional right to due process.

Count 2 - Use of a Secret, Arbitrary Algorithm Violates the Right
to Procedural and Substantive Due Process Under the Fourteenth Amendment of the
United States Constitution (Through 42 U.S.C. 1983)

**105.** Plaintiffs repeat, realleges & incorporates paragraphs 1 – 82 above.

**106.** Whenever a government agency apportions a benefit, procedural due process

requires that the agency explain its calculations in a clear manner. Substantive due process requires that the agency uses ascertainable standards to determine the benefit.

**107.** The state does make available on its website the spreadsheets used in needs assessment, but the underlying calculations are concealed within the program and not available to the average user. DHS does not explain this secret, internal algorithm anywhere, stating only that it is a "formula embedded in the functional needs assessment." 411-015-0005.

**108.** A consumer cannot meaningfully evaluate or understand the formula, except by entering all possible answers to dozens of questions by hand and reviewing the calculated hours of need in each scenario.

**109.** "[W]ritten notice must explain the formula by which the benefit amount was calculated." *Ford v. Shalala*, 87 F. Supp. 2d 163, 178 (E.D.N.Y. 1999) judgment entered sub nom. *Ford v. Apfel*, No. CV 94-2736 (CPS), 2000 WL 281888 (E.D.N.Y. Jan. 13, 2000). The risk of wrongful calculation of a benefit is particularly acute where a beneficiary has "no meaningful way to ascertain whether agency calculations as to grant amounts are accurate." *Schroeder v. Hegstrom*, 590 F. Supp. 121, 127 (D. Or. 1984).

**110.** A consumer trying to assess whether to appeal a service reduction or challenge any decission to reduce service levels at an administrative proceeding will necessarily lack the requisite understanding of the relationship between need and calculated benefit.

**111.** Because the algorithm is secret and concealed from the consumer, the standards DHS and LCOG use are effectively un-ascertainable, in violation of substantive due process.

112. Plaintiffs ask the court to enter a declaratory judgment in thier favor that the defendants have violated their constitutional right to due process.

Count 3 - The Exceptions Process Violates the Right to Procedural Due Process Under
the Fourteenth Amendment of the United States Constitution
(Through 42 U.S.C. 1983)

**113.** Plaintiffs repeat, realleges & incorporates paragraphs 1 – 90 above.

**114.** The basic premise of due process is that a person should have the right to
adequate notice and a meaningful opportunity to be heard, before deprivation of a
protected interest.

**115.** The defendants denied the plaintiffs adequate notice as to the exceptions payment
denial in this instance. However, in the boilerplate initial notice of reduction in services
provided by DHS to LCOG, consumers are given no explanation of their rights or their role
in the exceptions process, nor any explanation of what factors the committee will consider,
who sits on the committee, what law governs the process, or whether one can appeal the
outcome.

**116.** The defendants deny consumers in the Exceptions process the opportunity to
participate meaningfully, because consumers do not know what factors are considered in
the original award of hours, cannot attend the hearing, do not know what questions the
committee focuses on, are not entitled to respond to any inquiries from the committee, and
generally are not allowed to have any role in the process, other than by filing the original
application for an exception.

**117.** The risk of erroneous deprivation of benefits and services through the exceptions
process is high because each consumer's individuality in ADL related abilities affects
his/her life in a different manner and generates unique needs. Consumers may not know
how to access the exceptions process and cannot meaningfully participate in it to address
any questions that may arise.

Count 4 - The Administrative Appeal Procedures and Rules of DHS Violate the Right to
Procedural Due Process Under the Fourteenth Amendment of the
United States Constitution (Through 42 U.S.C. 1983)

**118.** Consumers are denied a meaningful opportunity to be heard, and there is no

administrative appeal process for individuals who reside in an Adult Foster Home because

DHS effectively prevents meaningful review of the adequacy of the benefit through a

circular definition.

**119.** Although consumers are entitled to all services required to meet their basic needs,

42 U.S.C 1392, the Oregon Administrative Rules define the service level for consumers to

be whatever level of service the needs assessment tool describes.

**120.** The hearing process is not a meaningful opportunity to be heard on whether the

defendants have met the consumer's legal right to the services the individual requires.

LCOG decides how many hours of care the needs assessment allots, and the needs

assessment determines the number of hours of care provided. That the assessment might

be wrong, inadequate, or not properly capture an individual person's needs is not a

permissible basis for review of the defendants' decision-making.

**121.** Because there is no administrative hearing process for Adult Foster Home providers

and/or Residential Facilities providers and because there is no meaningful opportunity to

review the substantial measures of adequacy of services under federal law, the process

violates the Fourteenth Amendment.

Count 5 - The Americans With Disabilities Act, Title II (42 U.S.C. 12131 et seq.)

**122.** Title Two of the Americans with Disabilities Act prohibits discrimination against

people with disabilities by public entities. 42 U.S.C. 12132.

**123.** State agencies providing services must provide them in the most integrated setting

possible. 28 C.F.R. § 35.130(d).

**124.** Unnecessary confinement, isolation, or segregation of people with disabilities

constitutes discrimination because it stems from an irrational belief that people with disabilities cannot or should not participate in public life and because it unreasonably restricts their liberty to participate in that public life. Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 600 (1999).

**125.** Cuts to home and community based services (in-home care services) by a state social service agency that exacerbate the risk of isolation and segregation for the elderly and/or people with disabilities violates the Americans with Disabilities Act. M.R. v. Dreyfus, 663 F.3d 1100, 1111 (9th Cir. 2011) (en banc), as amended 697 F.3d 706 (9th Cir. 2012) (en banc). Cuts to home and community based services (in-home care services) that effectively confine someone to [his/]her home and reduce [him/]her ability to have contact with the community, such as by visiting grocery stores, shops, malls, post offices, libraries, public pools, parks, and churches, also violate the integration mandate. 28 C.F.R.; see also 42 C.F.R.

**126.** The Oregon Department of Human Services, headed by Mr. Pakseresht, the office of Aging and Peoples with Disabilities, headed by Ms. Carson-Cottingham, and the Senior and Disability Services directed by Jody N. Cline, a division within the Lane Council of Governments are public entities within the meaning of the Americans with Disabilities Act. 42 U.S.C. 12131(1); Henrietta D. v. Bloomberg, 331 F.3d 261, 288 (2d Cir. 2003) (Title II suit properly maintained against agency head in official capacity under Ex Parte Young theory).

**127.** DC, DH, and GR are people with disabilities within the meaning of the ADA. 42 U.S.C. 12131. The most integrated possible setting appropriate for the plaintiffs is a home based setting in thier communitiy, if they are provided appropriate supports.

**128.** They are entitled to live in their residence in the adult foster home and receive adequate state support to prevent segregation and isolation from their community on the

basis of disability and/or being elderly.

**129.** The plaintiffs have authority to seek redress for violations of Title II by suit in Federal court. 42 U.S.C. 12133; 29 U.S.C..

Count 6 - Violation of the Rehabilitation Act (29 U.S.C. 794)

**130.** A recipient of federal funds, including Medicaid funds, must not discriminate against people with disabilities. 29 U.S.C. 794.

**131.** The Oregon Department of Human Services, the Office of Aging and People with Disabilities, the Office of Developmental Disability Services, and LCOG each receive, handle, and disburse federal Medicaid funds and other federal funds.

**132.** The Rehabilitation Act's prohibition against discrimination is interpreted co-extensively with the ADA. Duvall v. Cty. of Kitsap, 260 F.3d 1124, 1135 (9th Cir. 2001), as amended (Oct. 11, 2001).

**133.** Enabling regulations of the Rehabilitation Act, like those of the ADA, require services be provided to elderly people and adults with disabilities in the "most integrated setting" appropriate to the individual.

**134.** The Rehabilitation Act similarly prohibits the defendants from limiting in-home services in a way that increases the risk of isolation or unnecessary placement in a more restrictive setting, just as the Americans with Disabilities Act does.

**135.** The defendants have violated DC's, DH's and GR's right to receive services in the most integrated setting under the Rehabilitation Act. They have the right to seek redress for such a violation by suit in federal court. 29 U.S.C..

Count 7 - Violation of Chapter XIX of the Social Security Act (42 U.S.C. 1396 et seq. Through 42 U.S.C. 1983)

**136.** The state of Oregon receives Medicaid funds from the federal government for many consumers aged 65 or older for people with disabilities, including GR, DH and DC through state programs (Medicaid authority 1915) administered by DHS and its applicable

branches and agents (such as LCOG), depending on the consumers' assessed needs.

**137.** Under the various 1915 plan provisions, the state must "make available home and community-based attendant services and supports to eligible individuals, as needed, to assist in accomplishing activities of daily living, instrumental activities of daily living, and health-related tasks through hands-on assistance, supervision, or cueing . . . under a person-centered plan of services and supports that is based on an assessment of functional need . . . ." 42 U.S.C. 1396…...The defendants have already determined that GR and DC are eligible for services. Thier eligibility is not in dispute.

**138.** DHS must, having accepted 1915 plan funds, provide those attendant care services "as needed," not to the extent it feels capable of funding them. *Id.* Unlike other Medicaid programs where a state can ration its services under certain restrictions, DHS must fully meet all needs in serving eligible consumers. While DHS may place limits on the "amount, duration, and scope" of plan assistance, it must do so in a way that "reasonably achieve[s] the purpose of the service." 77 Fed. Reg. 26833 (May 7, 2012).

**139.** Although the defendants describe its assessment process as a "needs assessment," it has conducted no objective or scientific methodology of this process to ensure that it accurately determines individual need or that the number of hours it budgets to any individual client properly describes the need.

**140.** The needs assessment currently represents little more than guesswork by LCOG staff about how many hours might be needed by any single consumer and broad conjecture about how many hours of assistance any consumer needs.

**141.** The needs assessment also relies exclusively on broad qualitative categories, affording no individualized determinations of need within those categories. Two different people might need "full assists" in ambulation, but the number of hours per month actually needed for ambulation assistance might vary widely from one individual to the next. This

omission is at odds with the federal requirement that such a program be "person-centered" and "consumer controlled." 42 U.S.C. 1396.

**142.** Under Chapter XIX of the Social Security Act, GR and RV are entitled to recieve in-home care services that is needed to accomplish their ADLs living, in a manner directed by the individual consumer or his representative. DHS's denial of services adequate to meet consumer needs violate consumer's rights under the Social Security Act.

**143.** The plaintiffs are entitled to bring an action for individual relief of any violation of federal constitutional or statutory rights under color of state law. 42 U.S.C. 1983.

**144.** The provisions of 42 U.S.C. 1396 contain the kind of broad, rights-creating language enforceable under 42 U.S.C. 1983

145. Plaintiffs are entitled to declaratory relief from the court stating that their rights under federal law and the US Constitution have been violated by the defendants.

## VI. SECOND CLAIM FOR RELIEF

### Injunctive Relief

146. Plaintiffs repeats, realleges & incorporates paragraphs 1 – 123 above.

147. Plaintiff's seek injunctive relief from the court to enjoin the reduction of in-home care hours for DC, DH and GR and order defendants to restore the level of service to at least that afforded as of December 31, 2017.

148. Plaintiffs will likely prevail upon their claims as the defendants are unable to show that adequate notice and the plaintiff's due process rights were not violated by their conduct. The reduction of government benefits in disability programs and public welfare programs are a sufficient property interest to require due process protections before any change in status.

FIRST AMENDED COMPLAINT

149. The issues and arguments presented in this case bear a striking similarity to another case that is currently before this court, Civ. No. 6:17-cv-00564. An Order on Motion for Preliminary Injunction was signed by the Honorable Judge McShane on April, 19, 2017. (attached as exhibit 2 in original complaint)

150. RV, DC and DH are both severely disabled and require adequate in home care in order to help them achieve optimum physical, medical, and social well-being and independence. GR, DC and DH will suffer irreparable harm if the court doesn't grant injunctive relief.

151. The equities are balanced in favor of the plaintiffs as they are not seeking additional support from the state, merely a return to the level of support that was provided prior to December 31, 2017.

152. Injunctive relief against the state of Oregon Department of Human Services and it's agents from denying vulnerable citizens adequate care without first complying with all state and federal laws would be in the public interest.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for judgment against Defendants and requests the Court to grant relief as follows:

1. That the court declare that the protocols used for assessing individual needs and the use of a secret algorithm to calculate benefits violate the Due Process Clause, the Social Security Act, the Americans with Disabilities Act, & the Rehabilitation Act;

2. declaring that the current practices regarding the exceptions process and the administrative hearing processmeans of providing notice of reduction, suspension, denial, or termination of services violate the Due Process Clause of the United States Constitution;

3. immediately enjoining the reduction of in-home care hours for the named plaintiffs

FIRST AMENDED COMPLAINT

and those similarly residing in adult foster care homes owned and / or operated by Paul Kwake and order DHS to restore the level of service to at least that afforded as of December 31, 2017;

4. ordering DHS to rescind any current notices of reduction, denial, or termination of benefits to DH, DC and GR receiving in-home care and supports and to restore prospectively the prior level of benefit as of December 31, 2017 or grant the level of benefit sought, whichever is greater;

5. ordering DHS to halt future reductions, denials, and terminations of benefits for DH, DC and GR receiving in-home care and supports until the court approves a plan that meets the following criteria:

    i.)     the plan uses an assessment tool whose criteria are publicly available, based on scientific methodology & calculated to adequately adress individual needs;

    ii.)     the plan details improved notification procedures to inform consumers, in a manner reasonably calculated to inform them of the factual and legal basis of any reduction, denial, or termination; and iii.) the plan provides for adequate and separate procedures to review the

    adequacy of services to meet the consumer's needs and whether a consumer is put

    at increased risk of removal to a less integrated setting by the reduction,

    suspension, denial, or termination in services;

6. ordering LCOG to remove Marcy Yarbrough and Jordan Crowder from any further

role involving any residents of Paul Kwake's adult foster care homes.

7. declaring that the plaintiffs are a prevailing party and granting reasonable

attorney's fees and costs to the plaintiffs; and

8. granting other such appropriate relief as the court deems just and proper.

## VIII. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase

the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11A.

I agree to provide the Clerk's Office with any changes to my address where case related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Dated 7 May 2018

Paul Kwake, Plaintiff Pro Se

Daniel Campbell, Plaintiff Pro Se

Dorothy Hawley, Plaintiff Pro Se

Gary Romine, Plaintiff Pro Se

FIRST AMENDED COMPLAINT

CERTIFICATE OF SERVICE

I hereby certify that on 05-08-2018, I made service of th : following document:

FIRST AMENDED COMPLAINT by placing a copy in ì first-class postage paid

envelope in Eugene, OR for delivery by U.S. mail to ad( ress set forth below:

Christina Beatty Walters
Department of Justice
Council for: Fariborz Pakseresht

Department of Justice
100 SW Market Street
Portland, OR  97201

Sig: ature

Pau  Kwake
186 ì 17th Street #C
Spr ìgfield, OR 97477

CERTIFICATE OF SERVICE

I hereby certify that on 05-08-2018, I made service of the following document:

FIRST AMENDED COMPLAINT by placing a copy in a first-class postage paid

envelope in Eugene, OR for delivery by U.S. mail to address set forth below:


Christina Beatty Walters
Department of Justice
Council for: Ashley Carson Cunningham

Department of Justice
100 SW Market Street
Portland, OR  97201


_____
Signature

Paul Kwake
1865 17th Street #C
Springfield, OR 97477

## CERTIFICATE OF SERVICE

I hereby certify that on 05-08-2018, I made service of th  following document:

FIRST AMENDED COMPLAINT by placing a copy in  ı first-class postage paid

envelope in Eugene, OR for delivery by U.S. mail to adc ess set forth below:

Andrea D. Coit
Hutchinson Cox
Council for: Jody N.Cline

940 Willamette Street
Suite 400
PO Box 10886
Eugene, OR 97440

Sigı ature

Pau  Kwake
186   17th Street #C
Spri ıgfield, OR 97477